Filed 12/28/21  P. v. Saucedo-Zepeda CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>ENRIQUE SAUCEDO-ZEPEDA,<br><br>        Defendant and Appellant. | A160101<br><br>(City & County of San Francisco Super. Ct. No. SCN230061) |

Defendant Enrique Saucedo-Zepeda appeals after a jury found him guilty of two counts of rape.  On appeal, defendant argues:  (1) the prosecutor engaged in misconduct; (2) defense counsel provided ineffective assistance; (3) insufficient evidence supported the verdicts; and (4) multiple errors caused cumulative prejudice.  We affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

The People charged defendant with rape of a person who was unconscious or asleep (Pen. Code, § 261, subd. (a)(4)(A),[1] count I), and rape of a person who was prevented from resisting by any intoxicating or anesthetic substance, or controlled substance (§ 261, subd. (a)(3), count II), both occurring on or about May 20, 2014.  A jury convicted defendant of both counts.  The trial court sentenced defendant to six years in prison on count I

_____

[1]        All further statutory references are to the Penal Code unless otherwise indicated.

and, pursuant to section 654, imposed but stayed a three-year term on count II.

The following is a brief summary of some of the trial evidence. The victim, W.V., testified that in May 2014, she attended a party at defendant's home with her then-boyfriend, E.Y.[2] The victim is four feet 10 inches tall, and at the time weighed about 125 pounds. She arrived at the party around noon, and by 4:00 p.m. she had consumed four to five beers and two shots of tequila, and started to feel sleepy. She told E.Y., who obtained defendant's permission for her to lie down in his room. The victim and E.Y. went to defendant's room, where E.Y.'s cousin was asleep on another bed. The victim fell asleep fully clothed.

The victim awoke when she felt she was being penetrated, and she knew it was not E.Y. She opened her eyes and said "no," to which defendant responded by pulling his penis out of her, pulling up his pants, and leaving. She did not see him remove a condom and did not think he wore one. After defendant pulled out, her vagina felt wet, like he had ejaculated. The victim pulled up her clothes and, shortly thereafter, E.Y. entered the room and she asked him to get her out of there.

The victim testified she cried and was in disbelief after the incident, but did not immediately tell E.Y. what happened because she was embarrassed and scared that he may have had some role in it. Around 2:00 a.m., she heard E.Y. receive a call from defendant asking why they had left and if something happened; E.Y. responded they were fine and asleep. Around 8:00 a.m., the victim finally told E.Y. what happened. Shocked, E.Y.

---

[2]     Pursuant to the California Rules of Court, rule 8.90, governing "Privacy in opinions," we refer to the victim and her former boyfriend by their initials only.

called defendant and confronted him, asking why he had done that if they were friends, and saying that he could not believe defendant had abused the victim. Defendant asked E.Y. to excuse him and said he was drunk. After the call, E.Y. tried to calm the victim down, but seemed not to want to report the matter to the police. Later that day, the victim disclosed the incident to a friend who called the police.

The police took the victim to the hospital for a sexual examination, which revealed some injuries to her genitalia. The forensic nurse specialist swabbed various parts of the victim's body and collected her underwear. One prosecution criminalist who analyzed the deoxyribonucleic acid (DNA) evidence testified it was "pretty conclusive" that defendant was a contributor to the sperm mixture found on vaginal swabs taken from the victim.[3]

After the examination, the police and victim conducted a pretext call, which was recorded and admitted into evidence. During that pretext call, the victim accused defendant of having sex with her while she was sleeping. Defendant responded that he owed her an apology, then the phone line disconnected. The victim called him back and asked for the truth and if he had diseases. She indicated she did not want to tell the police because she knew he had a family. He responded he had no diseases and said he knew and accepted that he messed up. He also repeatedly apologized. The victim asked if defendant had "finished" inside of her, and he responded: "No, I did not finish. As I said, I was just starting to try to have sex. [¶] . . . [¶] When

---

[3] This criminalist, who worked with the San Francisco Police Department, conducted DNA analysis to determine the statistical probability that defendant contributed to the DNA mixture. While testifying the results were "pretty conclusive" that defendant was a contributor, the criminalist acknowledged that DNA can be indirectly transferred without intimate touching, such as by sleeping in someone else's bed.

you woke up and said no, I said 'Ok.' I pulled out." The victim responded, "I did not say no. I just woke up . . ." Defendant then explained, "Yes, I mean you woke up and said 'Oh, no,' that's when I stopped and pulled out." Defendant admitted he took advantage of the fact that she was alone to go inside the room. At one point, he tried to deny penetrating the victim. When pressed, however, he soon conceded, "Maybe once" and then "Yes, you — I penetrated you, you woke up and I pulled out. Okay? I did not finish."

E.Y. testified when the victim went to lie down in defendant's bedroom at around 2:00 or 3:00 p.m., they had sex. He then left her in the bedroom for about two hours while he played cards with the others in the yard. E.Y. recalled that at some point, defendant said he needed to use the bathroom and was gone for 10 to 15 minutes. E.Y. went back to the bedroom at around 4:00 or 5:00 p.m. The victim was crying on the bed and asked him to "get her out of the room as soon as possible." After leaving, the victim was inconsolable and later disclosed that defendant had raped her. E.Y. further recalled that defendant called at around 11:00 p.m., asking why he left, and E.Y. just said he had things to do. The next day, E.Y. called and confronted defendant, asking why he abused the victim, to which defendant responded by asking for forgiveness and saying he was drunk. E.Y. and the victim subsequently ended their relationship.

Defendant took the stand in his defense. He testified that E.Y., E.Y.'s brother, and E.Y.'s cousin arrived around 9:30 a.m. the day of the party. The victim—whom defendant never met before—arrived around noon. Defendant saw the victim drink beer and tequila, and he himself drank a lot that day. At some point, he felt drunk, so he went to his room to rest not knowing the victim was there. When he woke up, the victim was in his bed, and he saw she was awake. Her eyes were open, and she "responded" to his touch—

4

meaning she did not say "no" and she touched him back, though he could not remember how she touched him. He testified on direct examination that he took off her pants and underwear, did not put on a condom, and they started having sex. He could not remember if he penetrated her, but he tried to. On cross-examination, he said he remembered penetrating her, but only once.

According to defendant, E.Y. called him the next day upset and asked generally "why did [he] do that," to which defendant apologized. E.Y. told defendant he was going to call the police, to which defendant responded, "that's fine." The victim called him, too, and he agreed with her accusations because she sounded angry and he did not want to anger her more. That night, while defendant was at the store, the police went to his house. His uncle told him to leave because all the residents were immigrants and he did not want any problems. Afraid of the police and of being arrested, defendant left that night for Fresno, where he was arrested about three years later in April 2017.[4]

After his arrest, defendant was interviewed by Sergeants Wendy Bear and Priscilla Kenney of the San Francisco Police Department. He told them he went to Fresno because he was afraid. He affirmed he walked into the bedroom, saw the victim asleep, and thought to have sex with her. He said he used a condom and had sex with the victim while she was asleep. When they asked if he had questions or anything to say that could help him, defendant responded he felt bad and said, "Nothing is to my favor." During

---

[4] Defendant, E.Y., and E.Y.'s brother all worked for the same employer. The employer testified that when the alleged incident occurred, he heard E.Y. and another employee having an intense conversation at work. When the employee told him what had occurred, the employer told E.Y. to go home because he thought he should be with his girlfriend. Defendant never picked up his last paycheck, and the employer never heard from defendant again.

trial, defendant testified he made admissions during this interview because Sergeant Bear had been insistent, he was scared, and he wanted to agree with the police.

## DISCUSSION

### A. Alleged Prosecutorial Misconduct During Closing Argument

Defendant alleges the prosecutor committed misconduct during closing argument in several ways. We address the claims below, but first set out some general principles.

"A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process. Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury." (*People v. Morales* (2001) 25 Cal.4th 34, 44.) "Misconduct that does not constitute a federal constitutional violation warrants reversal only if it is reasonably probable the trial outcome was affected." (*People v. Shazier* (2014) 60 Cal.4th 109, 127.) To prevail on a claim of prosecutorial misconduct based on remarks to the jury, the defendant must show " '[i]n the context of the whole argument and the instructions' [citation], there was 'a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner. [Citations.] In conducting this inquiry, we "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements.'" (*People v. Centeno* (2014) 60 Cal.4th 659, 667 (*Centeno*).)

*1. Argument that even if the jury believed defendant, he was guilty*

Defendant contends the prosecutor misstated the law by arguing that even if the jury believed his testimony, he was still guilty. More specifically, with regard to the offense of rape of an unconscious person (count I), defendant claims the prosecutor wrongly told the jurors he would still be guilty even if they believed his testimony that he thought the victim was awake when they started having sex because her eyes were open and she responded to his touch. Starting from the premise that an element of the offense is the defendant's knowledge that the victim was unable to resist because she was unconscious of the nature of the act, defendant contends the jurors should not have found him guilty if they believed his testimony that the victim's eyes were open and that she responded to his touch.

Defendant makes a similar argument concerning the charge of rape of an intoxicated person (count II). Noting the offense requires proof that the defendant knew or reasonably should have known that the effect of the intoxicating substance prevented the victim from resisting, he highlights his testimony that the victim walked, talked, and danced during the party before she went to his bedroom. He also highlights that before having sex, she woke up and began touching him, and then told him to stop. Because all these actions that he observed "would have led a reasonable person to believe that [the victim] was capable of consenting to intercourse" and "that alcohol did not prevent her from resisting," he argues the jurors should have found him not guilty if they believed his testimony.

"As a general rule, ' "[a] defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion, and on the same ground, the defendant objected to the action and also requested that the jury be admonished to disregard the perceived impropriety." ' " (*Centeno, supra*, 60

7

Cal.4th at p. 674.) We excuse a defendant's failure to do so only "if an objection would have been futile or if an admonition would not have cured the harm caused by the misconduct." (*Ibid.*)

Here, defense counsel did not object to the portions of argument at issue, and nothing in the record indicates that an objection would have been futile or that an admonition could not have cured the alleged harm. Defendant has forfeited review of this claim.

Anticipating this forfeiture, defendant posits defense counsel rendered ineffective assistance. Specifically, defendant argues there was no rational tactical reason for not objecting, and the failure to do so was prejudicial because the prosecutor's argument "allowed the jury to find [him] guilty on an erroneous legal theory." We are unpersuaded.

To demonstrate ineffective assistance, a defendant must show both that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, and that the deficient performance was prejudicial. (*Strickland v. Washington* (1984) 466 U.S. 668, 687 (*Strickland*).) "A defendant who raises the issue on appeal must establish deficient performance based upon the four corners of the record. 'If the record on appeal fails to show why counsel acted or failed to act in the instance asserted to be ineffective, unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation, the claim must be rejected on appeal.' " (*People v. Cunningham* (2001) 25 Cal.4th 926, 1003.)

In assessing whether defense counsel rendered deficient performance, we first evaluate whether there was prosecutorial error or misconduct necessitating an objection and admonition. While it is improper for a prosecutor to misstate the law to the jury (*Centeno*, *supra*, 60 Cal.4th at

8

p. 666), a defendant who attacks the remarks of a prosecutor "must show that, '[i]n the context of the whole argument and the instructions' [citation], there was 'a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner. [Citations.] In conducting this inquiry, we "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements.' " (*Id.* at p. 667.)

Here, the prosecutor never urged the jury to ignore any of the elements of the offenses. Taken in context, the prosecutor's argument properly focused the jury's attention on the elements of the charged offenses and reasonably sought to counter defendant's claim of innocence based on his testimony that the victim's eyes were open, she was responding, and she did not resist when he took her clothes off.

As defendant points out, the prosecutor did in fact tell the jurors that "even if you believe him, he's still guilty of Count 1 and Count 2." Reasonably understood, however, the prosecutor was not encouraging the jurors to ignore the elements of the offenses. Rather, the thrust of the prosecutor's argument for count I was that even if the jurors believed defendant's testimony that the victim's eyes were open and she was responding, this should not impact their assessment of the element of the offense requiring that the victim be "unable to resist because she was unconscious of the nature of the act." And later, with regard to count II, the prosecutor was emphasizing that defendant's testimony did not undermine the evidence proving that defendant either knew or reasonably should have known the effect of the alcohol on the victim prevented her from resisting, because, despite his testimony that her eyes were open and she was responding, he had no real reason to believe she was

9

capable of consenting or resisting, nor would a reasonable person entertain such a belief.

In sum, we conclude no prosecutorial misconduct or error necessitating an objection occurred. Having heard the trial court's instructions as to the elements of counts I and II,[5] and given the context of the prosecutor's remarks, there is no reasonable likelihood the jurors believed they could convict defendant even if they believed his testimony negated elements of the charged offenses. While we could end our analysis here, we briefly add that " '[t]he decision facing counsel in the midst of trial over whether to object to comments made by the prosecutor in closing argument is a highly tactical one . . . .' [citations], and 'a mere failure to object to evidence or argument seldom establishes counsel's incompetence' [citation]." (*Centeno*, *supra*, 60 Cal.4th at p. 675.) In this case, the record is silent as to the reason for defense counsel's alleged omissions, and it cannot be said there could be no satisfactory explanation. Counsel might reasonably have believed his own arguments, coupled with the court's instructions, could best counter the prosecutor's arguments. (*People v. Frierson* (1991) 53 Cal.3d 730, 749 ["[I]n the heat of a trial, defense counsel is best able to determine proper tactics in the light of the jury's apparent reaction to the proceedings. The choice of when to object is inherently a matter of trial tactics not ordinarily reviewable on appeal."].)

In any event, defendant fails to establish prejudice resulting from counsel's alleged deficiency, i.e., "a 'reasonable probability that, but for

----

5     As to count I, the record discloses the trial court correctly instructed that the jury must find defendant "knew that the woman was unable to resist because she was unconscious of the nature of the act." As to count II, the court correctly instructed that the jury must find defendant "knew or reasonably should have known that the effect of an intoxicating substance prevented the woman from resisting."

counsel's unprofessional errors, the result of the proceeding would have been different.'" (*Strickland, supra*, 466 U.S. at p. 694.) The specific statements during argument at issue were relatively brief; the court properly instructed the jury as to the elements of counts I and II; and defense counsel offered direct counterargument explaining the elements.[6] Moreover, the court explicitly instructed that if "the attorneys' comments on the law conflict[ed] with [the court's] instructions," the jury "must follow [the court's] instructions." (*People v. Osband* (1996) 13 Cal.4th 622, 717 [" '[w]e presume that jurors treat the court's instructions as a statement of the law by a judge, and the prosecutor's comments as words spoken by an advocate in an attempt to persuade.' "].)

Additionally, this was not a close case and the evidence against defendant was overwhelming. The victim testified, and other evidence such as E.Y.'s testimony and the DNA evidence generally corroborated her testimony.

Moreover, the evidence showed that defendant made a number of damaging inculpatory statements. When E.Y. confronted defendant about "abus[ing]" the victim, defendant did not deny the accusation; instead, he apologized and told E.Y. that he was drunk. Defendant made more explicit

---

6      Consistent with the trial court's instructions, defense counsel emphasized the offense of rape of an unconscious person required that defendant subjectively know the victim was unconscious. Similarly, defense counsel emphasized the offense of rape of an intoxicated person required evidence showing defendant subjectively knew, or reasonably should have known, that alcohol prevented the victim from resisting. Defense counsel also stated: "the burden is on the DA to prove to you that [defendant] did not really and reasonably believe that [the victim] was capable of consent. If they don't meet to [*sic*] burden, you must find him not guilty." Defense counsel then went on to discuss why defendant could believe the victim was consenting.

and damaging admissions during the pretext call with the victim. Significantly, he admitted to the victim that "you woke up and said 'Oh, no,' that's when I stopped and pulled out." Defendant tried only once to claim he did not penetrate the victim, but quickly capitulated when the victim pushed back. Defendant also admitted that he fled from San Francisco to Fresno knowing the police were looking for him. Then, when he was arrested three years later, he again admitted having sex with the victim when she was asleep.

Finally, defendant was the defense's sole witness, and his testimony did little to create a reasonable doubt. He testified he knew the victim was drunk at the party and claimed he woke up next to her in his room. When he touched her, she appeared to be awake and touched him back in response. But defendant could not recall any details about how she allegedly touched him. Though he initially testified he did not remember penetrating her, eventually he testified that he did. Once she told him "no," he pulled up his pants and "got out of there" without asking why she suddenly wanted to stop. He tried to explain his earlier incriminating statements to E.Y., to the victim during the pretext call, and during the police interview, but his attempts to justify his prior statements could easily be viewed as self-serving. On this record, there is no reasonable probability that the result of the proceeding would have been different had counsel objected to the portions of prosecutorial argument at issue.

### 2. *Appeals to sympathy and emotion*

Defendant next contends that the prosecutor improperly appealed to emotion and for victim sympathy, and that she invited the jurors to put themselves in the victim's shoes. The following are the challenged portions of argument.

12

The prosecutor started her closing argument by stating: "Can you see her? Can you see her in that room waking up to the defendant standing over her, grasping her hips with himself fully inside of her? Can you see the look of shock on her face when she wakes up to that? [¶] Can you see her and hear her say, no, I don't want this? And can you see the defendant pull up his pants and run out of the room? Can you see her as the weight of what just happened to her washed over her, and she pulls herself together, and the reality that she had just been raped crashes down on her? [¶] Can you see her trying to hold it together when [E.Y.] comes in the room? And can you hear and see her say get me out of here? [¶] Six years. Six years, [the victim] has been living with what happened to her that day. She has replayed it over and over and over. Can you see her in bed that night, unable to sleep, looking at her phone, trying to piece together the timeline of what happened." Shortly afterward, the prosecutor stated: "But if you remember what she told you, what she told the police, what she told [E.Y.], if you remember those things, then the six years of waiting will not be for nothing, and [the victim] will finally be able to know that her rapist was held accountable."

Near the end of her closing argument, the prosecutor said: "[The victim] told you at the end of her testimony why she was here. She just wants him to admit what he did. She has nothing to hide. The thing that sticks with her is him hovering over her in between her legs, with his penis inside of her, grabbing onto her hips. That's the first thing that comes to her mind when she thinks about that day. And it's the thing that has stuck with her as she's tried to move on, as she's tried to make sense of what happened to her, as she looks town [sic] at her own baby girl and tries to recover from that."

"It has long been settled that appeals to the sympathy or passions of the jury are inappropriate at the guilt phase of a criminal trial." (*People v. Fields* (1983) 35 Cal.3d 329, 362.) "[A]n appeal to the jury to view the crime through the eyes of the victim is misconduct at the guilt phase of trial . . . ." (*People v. Stansbury* (1993) 4 Cal.4th 1017, 1057.) But even assuming the cited portions of the prosecutor's argument were improper, defendant lodged no objection and made no request for an admonition.

Defendant suggests an objection would have been futile because the trial court overruled relevance objections when the victim was asked how thinking about and describing what happened to her made her feel. This is unpersuasive. There is no reason to believe the court's overruling of two different objections raised during the victim's earlier testimony might portend the overruling of a prosecutorial misconduct objection during argument and the refusal of an admonition. (See, e.g., *People v. Seumanu* (2015) 61 Cal.4th 1293, 1339 (*Seumanu*).) We conclude that review of this claimed error was forfeited.

As for defense counsel's failure to object, defendant again has not established either prong of an ineffective assistance claim. On the deficient performance prong, even assuming the prosecutor made an improper appeal to the sympathy or passions of the jury, defense counsel might reasonably have believed he could best counter the argument—not by objecting, which might appear insensitive or dismissive of the victim's emotions—but through his own argument. Notably, the trial court had instructed the jurors not to allow bias or sympathy to influence their decision and cautioned that nothing the attorneys said, including in closing arguments, is evidence. Coupled with those instructions, defense counsel argued: "If you empathize with [the victim's] need for closure, that cannot erase the fact that on that night at a

14

critical moment, there was a big gap in her memory. She was for that moment fully functioning, blackout drunk. And to this day, she still doesn't know it. Completely sure and totally wrong." And defense counsel pointedly reminded the jurors of their sworn oath to be fair and impartial, to presume defendant innocent until proven guilty beyond a reasonable doubt: "Don't let your feelings influence your decision. You should critically analyze the DA's case with the voice of reason and no other voice. It's not a competition of who tips the scale. It's not a gut feeling." Based on the appellate record, we cannot conclude counsel's performance fell below professional standards.[7]

Defendant also fails to demonstrate prejudice. The prosecutor's alleged appeals to sympathy were a relatively brief part of her overall initial closing argument, and we presume the jury followed the trial court's instructions. And as discussed, this was not a close case. We conclude there is no reasonable probability the result of the trial would have been different but for counsel's failure to lodge an objection. (*Strickland, supra,* 466 U.S. at p. 694.)

### 3. *Attacking defense counsel's integrity*

Defendant also claims the prosecutor attacked the integrity of defense counsel and stated, or at least implied, that defendant and his counsel fabricated the defense to deceive the jury and absolve defendant.

Near the end of her initial closing argument, the prosecutor said defense counsel was going to try to explain away why defendant might not be guilty and, "when you hear these things or something that sounds like these things, what they really mean is something completely different. He's going

---

[7] Having reached this conclusion, we need not and do not address the People's alternative argument that the prosecutor's argument was not error or misconduct. We suggest no outcome as to the arguments we do not address. This applies to the People's alternative arguments regarding defendant's other claims, addressed below.

15

to package them nicely.  He's going to say them like the good guy, but it's all, every single one of them hits at the underpinnings of why it's taken this long to believe women who say that they're raped.  [¶] She came onto him.  She wanted it.  It was a regrettable experience.  She changed her mind, so she made up the rape story.  What that's really saying is that she's a ho. . . .  She'll sleep with whoever, and she didn't want to look bad, but that makes no sense given the evidence that you've heard."

During her rebuttal argument, the prosecutor indicated defense counsel argued the jury should ignore the DNA evidence "because it validates and confirms the direct testimony."  The prosecutor indicated defense counsel made arguments to distract the jury from the evidence:  "Talk about the system.  Talk about immigration.  Talk about what's at stake for [defendant].  Don't pay attention to the evidence.  That's essentially what [defense counsel] told you to do.  *He told you to disregard the oath you took*."  (Italics added.)  The prosecutor also asserted E.Y. and the victim had no reason to lie and "[t]he person who has a motive to lie here is the defendant.  And he's the only one with all of the information.  That's how he knows what to lie about."  Further, the prosecutor remarked:  "They gave him opportunity after opportunity to explain himself.  And only now six years later, do we get a fabricated story that would completely magically absolve him of any guilt.  So a witness's testimony is only suspicious if there's alcohol involved . . . .  [Defense counsel] said that."

As with the preceding claims of prosecutorial misconduct, defendant largely forfeited this claim of error by failing to make specific objections or request admonitions.  While counsel objected generally after the prosecutor argued defense counsel "told you to disregard the oath you took" by stating "improper argument," she failed to specify the impropriety of the argument as

16

presented on appeal and to ask for an admonition.[8] (*People v. Pearson* (2013) 56 Cal.4th 393, 425.)  However, even if we were to overlook the lack of objections or a more specific objection than the one made, we would reject the claim of misconduct.

" ' "A prosecutor commits misconduct if he or she attacks the integrity of defense counsel, or casts aspersions on defense counsel." ' " (*Seumanu, supra,* 61 Cal.4th at pp. 1336–1337.)  "The unsupported implication by the prosecutor that defense counsel fabricated a defense constitutes misconduct." (*People v. Bain* (1971) 5 Cal.3d 839, 847.)  " ' "In evaluating a claim of such misconduct, we determine whether the prosecutor's comments were a fair response to defense counsel's remarks" [citation], and whether there is a reasonable likelihood the jury construed the remarks in an objectionable fashion [citation].' [Citation.] '. . .  In conducting this inquiry, *we "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning* from the prosecutor's statements.' " (*Seumanu,* at p. 1337, italics added.)

Here, the prosecutorial comments complained of were largely fair argument either in anticipation of or in response to the defense's case. Indeed, the prosecutor correctly anticipated defense counsel's closing argument that the victim consented.  The remark that defense counsel was going to package the defense in saying things "like the good guy," was "clearly recognizable as an advocate's hyperbole," not a personal attack on defense counsel's integrity. (*People v. Sandoval* (1992) 4 Cal.4th 155, 184.)

The prosecutor's comment that defense counsel told the jurors to "disregard the oath you took" appeared responsive to defense counsel's argument that the jury should essentially disregard the DNA evidence

---

8    The court overruled the objection.

because it was "totally useless" and "the only reason to put it on, it's sympathetic appeal." It also appeared directed toward the defense's argument that the evidence of the victim's genital injuries was "completely useless." That said, the prosecutor's remark nevertheless seemed to personally attack defense counsel, and the trial court should have sustained counsel's objection. (See *ante*, fn. 9.) All the same, this inappropriate comment did not amount to prosecutorial misconduct because it cannot be said to have "infect[ed] the trial with such a degree of unfairness as to render the subsequent conviction a denial of due process" in violation of the federal Constitution. (*People v. Shazier*, *supra*, 60 Cal.4th at p. 127.) Nor did it involve " ' "the use of deceptive or reprehensible methods to persuade the trial court or the jury." ' " (*Ibid.*) In any event, even assuming, generously, that this comment was misconduct, it was harmless because it is not reasonably probable that the trial outcome was affected by it. (*Ibid.*) The jurors were instructed to decide the case based on the evidence presented, and were cautioned that nothing the attorneys said, including in closing arguments, is evidence. Moreover, as already discussed, the evidence of guilt in this case was overwhelming. (See, e.g., *Seumanu*, *supra*, 61 Cal.4th at p. 1338.)

With regard to the contention that the prosecutor suggested fabrication, we do not agree with defendant that the prosecutor improperly accused both defendant *and* defense counsel of concocting defendant's story. The prosecutor never mentioned defense counsel when making the challenged remarks and at various other points in her argument the prosecutor clearly suggested defendant alone made up his story. For example, the prosecutor said: "[Defendant is] the only one that says that he's drunk, and he's the only one that says that she was awake. Because *in his mind* those are the only two things that make him not a rapist. They're the

18

most significant lies that he can say because *in his mind*, they absolve him." (Italics added.) Moreover, the prosecutor argued, "he's just up here telling you what he thinks you want to hear to absolve him of any guilt." Considered as a whole, the prosecutor's argument contended that defendant alone fabricated his story for trial. That is not misconduct. (*People v. Dykes* (2009) 46 Cal.4th 731, 773–774 [while a prosecutor cannot suggest "the jury draw inferences concerning defendant's guilt from conclusions regarding defendant's general bad character," " '[r]eferring to the testimony and out-of-court statements of a defendant as "lies" is an acceptable practice so long as the prosecutor argues inferences based on evidence rather than the prosecutor's personal belief resulting from personal experience or from evidence outside the record' "]; see *People v. Turner* (2004) 34 Cal.4th 406, 430 [" 'The prosecutor is permitted to urge, in colorful terms, that defense witnesses are not entitled to credence [and] to argue on the basis of inference from the evidence that a defense is fabricated . . . .' "].)

Defendant contends "[e]veryone in the courtroom knew that [he] was limited intellectually," so the prosecutor was clearly implying that he could only make up his defense with "the guiding hand of counsel." In support, he points to a jury deliberation note, asking if the jurors could consider defendant's intellect or their perceptions of his intellect. This is speculative and unpersuasive. The note does not reveal what anyone thought of defendant's intellect, much less support that "everyone" thought he was so intellectually limited that he could not have fabricated the story he told on the stand on his own. Defendant has failed to show misconduct based on the cited remarks.

Because there was no misconduct, prejudicial or otherwise, defense counsel did not render ineffective assistance in failing to object to the

19

challenged portions of the prosecutor's argument. (*People v. Sanchez* (2019) 38 Cal.App.5th 907, 915.)  Nor is reversal warranted based on the one instance in which the trial court should have sustained counsel's objection to the prosecutor's assertion that defense counsel was urging the jurors to disregard their oath.

### 4.  Pretrial silence

Defendant's last claim of misconduct is that the prosecutor improperly remarked on his pretrial silence, as follows.  First, while discussing defendant's testimony that the victim responded to his touch, the prosecutor said:  "He never says that when he's talking to [the victim].  He never says I thought you were into it.  He never says it until he's up here, and he's had six years to think about this multipart lie that absolves him magically."  Second, the prosecutor argued that defendant was "the only one that ever says that it happened, and he waits six years, six years he waits to tell it."  Third, the prosecutor stated:  "[The police officers who interviewed him] gave him opportunity after opportunity to explain himself.  And only now six years later, do we get a fabricated story that would completely magically absolve him of any guilt."

Again, the claim is forfeited because defendant neither objected nor requested admonitions.  In any case, we cannot agree the prosecutor improperly commented on defendant's right to silence, and consequently, cannot conclude his ineffective assistance of counsel claim has merit.

In petitioner's view, the prosecutor's arguments were improper under *Doyle v. Ohio* (1976) 426 U.S. 610 (*Doyle*) and violated his right to remain silent after appointment of counsel.  In this regard, defendant relies principally on *People v. Belmontes* (1988) 45 Cal.3d 744, wherein the court commented that, on the one hand, the prosecutor's questions on cross-

examination could properly have served to impeach the defendant by "point[ing] out the inconsistencies between defendant's extrajudicial statements and trial testimony," but which "[a]s *worded* . . . just as readily could have elicited defendant's testimony that he made no statements about the crime *between* his third jailhouse statement and trial, and thus technically ran afoul of *Doyle, supra*, 426 U.S. 610." (*Belmontes*, at pp. 785–786, first italics added.) For the reasons below, no error appears.

As the California Supreme Court explains, *Doyle* held it was a violation of due process and fundamental fairness to use the postarrest silence of a defendant following the receipt of *Miranda*[9] warnings to impeach the defendant's trial testimony.[10] (*People v. Collins* (2010) 49 Cal.4th 175, 203 (*Collins*).) "An assessment of whether the prosecutor made inappropriate use of defendant's postarrest silence requires consideration of the context of the prosecutor's inquiry or argument. [Citation.] A violation of due process does not occur where the prosecutor's reference to defendant's postarrest silence constitutes a fair response to defendant's claim or a fair comment on the evidence." (*People v. Champion* (2005) 134 Cal.App.4th 1440, 1448.) " '[A] prosecutor is given wide latitude to vigorously argue his or her case and to make fair comment upon the evidence, including reasonable inferences or deductions that may be drawn from the evidence.' " (*People v. Dykes, supra*, 46 Cal.4th 731, 768.)

For example, in *Anderson v. Charles* (1980) 447 U.S. 404, a defendant was charged with murder after being found in possession of the victim's car.

---

[9]     *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

[10]     The People contend the rule in *Doyle* only applies to the impeachment of a testifying witness. We will assume, for the sake of argument, that *Doyle* error can apply to a prosecutor's closing argument. (*Seumanu, supra,* 61 Cal.4th at p. 1334 & fn. 10.)

(447 U.S. at p. 404.)  During a police interview, he told the police he obtained the car from one place, but he testified at trial he obtained it from another place.  (*Id.* at p. 405.)  The prosecutor asked why he did not say the same thing about where he got the car when he was arrested, and if this was a " 'recent fabrication.' " (*Id.* at pp. 405–406.)  The high court found no violation of *Doyle*:  "The quoted colloquy, taken as a whole, does 'not [refer] to the [defendant's] exercise of his right to remain silent; rather [it asks] the [defendant] why, if [his trial testimony] were true, he didn't tell the officer that he stole the decedent's car from the tire store parking lot instead of telling him that he took it from the street.' [Citation.] . . . The questions were not designed to draw meaning from silence, but to elicit an explanation for a prior inconsistent statement." (*Anderson*, at pp. 408–409.)

In *Collins*, the defendant presented an alibi defense at trial that he never mentioned before, despite making several statements to the police. (*Collins*, *supra*, 49 Cal.4th at p. 199.)  The prosecutor questioned why the defendant never mentioned his alibi before, and during closing argument, asserted that the defendant's reasons for not telling anyone about his alibi were "unbelievably ludicrous" and "preposterous." (*Id.* at pp. 200–202.)  The California Supreme Court found no violation of the defendant's right to postarrest silence under *Doyle*, explaining: "Defendant was not 'silent' on his whereabouts at the time of the murder; he chose to provide varied explanations that differed from his trial testimony." (*Collins*, at pp. 203–204.)  The court also held the prosecutor properly focused on the inconsistencies in defendant's statements rather than a failure to reveal his alibi.  In the court's words, "the prosecutor properly questioned defendant about the different explanations he gave [the police]. . . .  [T]he prosecutor's questions regarding defendant's failure to come forward earlier with his alibi

were asked in the context of those interview statements.  The questions were a legitimate effort to elicit an explanation as to why, if the alibi were true, defendant did not provide it earlier.  As such, neither the questions nor the prosecutor's remarks in closing argument were 'designed to draw meaning from silence.' " (*Id.* at p. 204.)

The same is true here.  Considered in context, the prosecutor's remarks during argument were not meant to draw meaning from any post-*Miranda* or post-appointment-of-counsel invocation of silence.  Defendant made statements prior to trial that directly contradicted his trial testimony, and the record makes reasonably clear that the prosecutor meant to impeach defendant's trial testimony and credibility with his earlier conflicting statements. (See, e.g., *Anderson v. Charles*, *supra*, 447 U.S. at pp. 408–409; *Collins*, *supra*, 49 Cal.4th at p. 204.)  Indeed, the law is settled that it is "within the broad bounds of permissible argument to suggest that defendant's trial testimony . . . , far from representing the truth, differed from his prior statements and was framed to coincide with an imagined defense." (*People v. Dykes*, *supra*, 46 Cal.4th at p. 769.)  Because we conclude there was no prosecutorial misconduct, counsel's failure to object was not deficient. (*People v. Sanchez*, *supra*, 38 Cal.App.5th at p. 915.)

Finally, even assuming there was error and no rational purpose for not objecting to the challenged portions of argument, no prejudice appears. (*Strickland*, *supra*, 466 U.S. at p. 694.)  Such arguments were brief and, again, the evidence of guilt overwhelming.  We would reach the same conclusion even under the *Chapman* standard applicable to *Doyle* errors. (*People v. Thomas* (2012) 54 Cal.4th 908, 936–937.)

23

## 5. *Cumulative Prejudice*

Defendant claims reversal is warranted because of cumulative prejudice from the claimed prosecutorial misconduct and counsel's failure to object and request admonitions. Because we have found defendant forfeited the claims of misconduct and has not established ineffective assistance, we reject this claim as well.

## B. Ineffective Assistance and *Miranda*

Next, defendant argues defense counsel was ineffective in failing to present evidence showing that he was not fully informed of his rights under *Miranda*, *supra*, 384 U.S. 436, and that his purported waiver of those rights was not knowing and intelligent. We set out some additional facts before analyzing this claim.

### 1. *Additional Background*

On February 4, 2020, defense counsel moved to exclude defendant's police interview statements on the ground they were obtained in violation of *Miranda*. At the hearing to determine admissibility, Sergeant Bear testified that defendant appeared to only understand Spanish, so she asked Sergeant Kenney to assist her. Sergeant Kenney testified that Spanish is her first language and that she is a certified Spanish translator for the San Francisco Police Department. She has been so certified since around 2005, though there was gap in her certification from 2014 to 2018, which included the date of defendant's interview. Sergeant Kenney indicated her human resources representative notified her of the gap and the need for retesting because of "some discrepancy on the list," but she was never told she needed to recertify because of a deficiency in her translation skills.

Sergeant Kenney testified she read defendant his *Miranda* rights directly from a department-issued *Miranda* card in Spanish. While Sergeant

24

Kenney was on the stand, the recording of her "*Mirandizing*" defendant was played and the transcript provided to her. She affirmed that the portion of the transcript was accurate in terms of the Spanish transcription and the accompanying English translation. This portion of the transcript was admitted into evidence, as was the recording of the interview.

Defense counsel indicated at the hearing that his intended witness Ricardo Winkel, Ph.D., a psychologist, was unavailable, so the court continued the hearing. Two days before the continued hearing date, the defense provided Dr. Winkel's report to the prosecutor.

Among other things, Dr. Winkel reported that defendant said he had not understood his *Miranda* rights and, had he understood, he would have asked for an attorney at the time of the interrogation. Dr. Winkel, a native and fluent Spanish speaker, stated his review of a transcript of the interview showed "key errors" in how Sergeant Kenney conveyed defendant's *Miranda* rights to him. As relevant here, Dr. Winkel stated this transcript showed that when telling defendant that anything he said could be used against him in court, Sergeant Kenney allegedly used the terms " 'tribulum' " and " 'tribunum' "—which have no meaning in "any version of Spanish"—instead of "tribunal." Moreover, when informing defendant that if he could not afford an attorney, one would be provided to him before questioning, Sergeant Kenney used the words "contrar" and "se-semos"—again, words without meaning—but Dr. Winkel indicated Sergeant Kenney may have meant "contratar," (to hire) and "hacemos las preguntas," (ask the questions), respectively. Dr. Winkel concluded that because of these alleged errors, defendant did not comprehend his *Miranda* rights.

Dr. Winkel also stated he administered several psychological tests, one of which showed that defendant is "prone to offering false statements when

intimidated or confronted with authority." Dr. Winkel opined that defendant "is a highly suggestible individual with a propensity to conform to authority and offer false statements in a custodial interrogation." Further, he stated, "[w]hile there was no indication that the investigators applied improper pressure on [defendant], the misinterpretation of his *Miranda* rights in conjunction with his personal attributes (i.e., below-average intellectual ability, passive-dependent personality traits, vulnerability to offering false statements) may have compromised the validity of his confession."

The prosecutor filed a motion to preclude Dr. Winkel from testifying and to admit defendant's statements during his police interview. The prosecutor argued nothing was presented to establish Dr. Winkel's qualifications to administer the psychological tests to defendant or interpret their results. Nor was there any showing that such tests were regularly relied upon by experts in the field. Finally, the prosecutor argued that Dr. Winkel's opinions were conclusory and general and that the defense untimely produced the report.

At the continued hearing, defense counsel stated he would not be calling Dr. Winkel, after all, and had no evidence to present. Defense counsel did note his belief that the *Miranda* admonition was incorrectly given in Spanish, and that he would have his research team look into the matter and provide additional briefing if necessary.[11] The trial court denied defendant's motion, finding that defendant was properly advised of and waived his *Miranda* rights, and that the defense had not presented any evidence

---

[11] Jury selection in the case occurred on February 4–6, 2020, with opening statements scheduled for February 24, 2020. According to the prosecutor, the defense had the *Miranda* statement since defendant's arraignment in April 2017.

countering Sergeant Kenney's testimony that the translation of the recorded *Miranda* advisement was accurate.

### 2. *Discussion*

Defendant contends defense counsel was ineffective by failing to present testimony from Dr. Winkel or some other qualified Spanish speaker to show that defendant was not properly advised of his *Miranda* rights and thus did not knowingly and intelligently waive his rights.

Defendant fails to establish deficient performance. First, defendant's argument on appeal relies on Dr. Winkel's report that a transcript showed Sergeant Kenney essentially misspoke or mispronounced three words when giving the *Miranda* advisement: she said " 'tribulum' " and " 'tribunum' " instead of "tribunal," and she said "contrar" and "se-semos" when she may have meant "contratar" and "hacemos las pruguntas," respectively. Based on these perceived errors, Dr. Winkel opined that defendant did not knowingly and intelligently waive his rights. But that opinion is unsupported and misses the mark.

In assessing the sufficiency of *Miranda* warnings, "[t]he essential inquiry is simply whether the warnings reasonably " ' "[c]onvey to [a suspect] his rights as required by *Miranda*." ' " (*People v. Wash* (1993) 6 Cal.4th 215, 236–237; *California v. Prysock* (1981) 453 U.S. 355, 359 [no "talismanic incantation" is required when relaying one's *Miranda* rights].) Even assuming Sergeant Kenney mispronounced or misspoke the aforementioned words, there is nothing in the record indicating that the advisements, taken as a whole, failed to reasonably convey defendant's *Miranda* rights to him. Defendant himself never so testified. Indeed, defendant himself affirmed, when asked by Sergeant Kenney after each advisement, that he understood what she was saying. Sergeant Kenney herself testified that Spanish is her

27

first language and that the English translations of her advisements were accurate. After the February 13, 2020 hearing, defense counsel also never pursued the matter further, despite indicating he was going to have his research team look into it and submit additional briefing if an issue arose.

Even assuming defense counsel could have proven a *Miranda* violation and barred its presentation as part of the prosecution's case-in-chief, a statement obtained in violation of *Miranda* can still be presented during cross-examination as impeachment. (*Harris v. New York* (1971) 401 U.S. 222, 225–226; *People v. Hoyt* (2020) 8 Cal.5th 892, 936.) Considering the strength of the prosecution's case, and defendant's defense that the victim was awake and consented to sex, defendant had to testify in order to get his defense before the jury. This, in turn, would have led to the admissibility of the police interview as impeachment. Knowing this, defense counsel might reasonably have figured that the jury would ultimately hear defendant's interview statements, and so decided to focus on arguing that defendant made untrue admissions because he was afraid of the police. Indeed, defense counsel did make this argument. For instance, seizing on defendant's statement during the interview that he wore a condom, defense counsel pointed out this was impossible given the prosecutor's DNA evidence which showed he ejaculated inside the victim. Defense counsel claimed defendant made this and other untrue admissions—both during the interview and pretext call—due to fear of the police.

We note the admission of the police interview as impeachment evidence would have entitled the defense to a limiting instruction that such evidence could be used only to assess defendant's credibility rather than as substantive evidence of guilt. (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 62–63.) But counsel could reasonably have believed that fighting

the admission of the interview statements as part of the People's case-in-chief would provide only marginal benefit in this particular case, and that the better tactic would be to focus on using the admitted police interview to argue that defendant made untrue admissions.

Even assuming defense counsel performed deficiently, defendant cannot establish prejudice. The admissions made to the police were damaging, but the jury heard that defendant made other extremely damaging admissions during the recorded pretext call with the victim and that he never denied E.Y.'s accusation that he "abused" the victim. Even if the police interview had been relegated to consideration for impeachment purposes, the fact that defendant admitted to the crime three years after making similar admissions during the pretext call would have severely damaged the credibility of his testimony at trial, which his defense hinged on. On this record, there is no reasonable probability that the jury would have reached a different conclusion but for counsel's alleged deficiency.

## C.   Sufficiency of the Evidence

Finally, defendant contends there is insufficient evidence to support the convictions. With regard to his conviction for rape of an unconscious person, he claims the record does not establish that the victim "was unable to resist because she was unconscious of the nature of the act or was unaware that the act occurred or was occurring." He contends the victim "was aware of the nature of the act as it occurred and instantly protested." Additionally, he claims her testimony "was not substantial." We are unpersuaded.

"In assessing the sufficiency of the evidence, we review the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable trier of fact could find the [minor] guilty beyond a reasonable

29

doubt. [Citations.] Reversal on this ground is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' " (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

Rape of an unconscious person is an act of sexual intercourse accomplished against a person who is not the perpetrator's spouse and who "is at the time unconscious of the nature of the act, and this is known to the accused." (§ 261, subd. (a)(4).) In this context, " 'unconscious of the nature of the act' means incapable of resisting because the victim meets any one of the following conditions: [¶] (A) Was unconscious or asleep. [¶] (B) Was not aware, knowing, perceiving, or cognizant that the act occurred." (*Ibid.*) "[A] victim need not be totally and physically unconscious in order for the statute . . . to apply." (*People v. Ogunmola* (1987) 193 Cal.App.3d 274, 279.)

In this case, the evidence amply shows that defendant penetrated the victim while she was unconscious of the nature of the act because she was asleep. The victim testified that she woke up to defendant penetrating her. She testified upon waking, she said "no," and defendant pulled out and left, but her vagina was "very wet," as if he ejaculated. There was evidence that defendant's DNA was on the exterior and interior of the victim's vagina. And during the pretext call, defendant admitted he penetrated the victim while she was sleeping. The facts here bear no resemblance to those in *People v. Lyu* (2012) 203 Cal.App.4th 1293, which defendant relies on. (*Lyu*, at pp. 1296, 1301–1302.)

As for the charge of rape of an intoxicated person, defendant contends the record does not establish that the victim was so intoxicated she could not give legal consent. He notes the victim testified she was not feeling the effects of the alcohol when she awoke, and the evidence showed she walked and danced without losing her balance, talked without slurring, remembered

30

what occurred, dressed herself, told defendant "no," and told E.Y. she wanted to leave.  Defendant claims this shows the victim "possessed sufficient mental capacity to give legal consent despite her earlier drinking."  Again, we are unpersuaded.

Rape of an intoxicated person is an act of sexual intercourse accomplished against a person who is not the perpetrator's spouse who is "prevented from resisting by any intoxicating or anesthetic substance, or any controlled substance, and this condition was known, or reasonably should have been known by the accused."  (§ 261, subd. (a)(3).)  "[T]he statutory requirement that the victim was prevented from resisting by the intoxicating or anesthetic or controlled substance has been interpreted to mean that the victim was 'not capable of giving legal consent because of intoxication.' " (*People v. Lujano* (2017) 15 Cal.App.5th 187, 193.)  "Legal capacity is the ability to exercise reasonable judgment, i.e., to understand and weigh not only the physical nature of the act, but also its moral character and probable consequences."  (*People v. Giardino* (2000) 82 Cal.App.4th 454, 466.)

Here, there was evidence that the victim, a fairly small person, drank four to five beers and two shots of tequila in the span of about four hours.  She was not very used to drinking, and had drank tequila only once or twice before.  She testified she felt dizzy and intoxicated after drinking and by "4:00 in the afternoon, I felt like I was asleep."  She indicated she did not, in fact, consent to the intercourse; she woke up to it.

That there may have been evidence tending to support defendant's claim that the victim "possessed sufficient mental capacity to give legal consent despite her earlier drinking" is of no moment.  The bottom line is that substantial evidence supports the jury's ultimate conclusion that the victim was incapable of exercising reasonable judgment and consenting to sex.

## D. Cumulative Error and Prejudice

Defendant claims reversal is warranted because of cumulative prejudice from the alleged prosecutorial misconduct and defense counsel's alleged ineffective assistance. Although we have assumed error when the prosecutor, without objection, appeared to appeal to juror sympathy and emotion, and when the prosecutor made a comment that appeared to attack the personal integrity of defense counsel, defendant fails to demonstrate any attendant prejudice or ineffective assistance of counsel, and such errors were cumulatively harmless under any standard especially in light of the overwhelming evidence of his guilt. (See parts A.2 and A.3, *ante*; *People v. Williams* (2009) 170 Cal.App.4th 587, 646; *People v. Woods* (2006) 146 Cal.App.4th 106, 117.)

### DISPOSITION

The judgment is affirmed.

_____
Fujisaki, J.

WE CONCUR:


_____
Tucher, P. J.


_____
Petrou, J.


A160101/*The People v. Enrique Saucedo-Zepeda*

33